UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

SHIFT CAPITAL, INC.

      Plaintiff,
                                     Case No: 26-cv-20943-BB

vs.

ATIF BAWAHAB, IINN, INC., and
INSIGHT MANAGEMENT AND
CONSULTING SERVICES, INC.,

      Defendants.

_____

## FIRST AMENDED COMPLAINT

Plaintiff Shift Capital, Inc. ("Shift"), by and through its undersigned counsel, files this First Amended Complaint against defendants Atif Bawahab ("Bawahab"), IINN, Inc. ("IINN"), and Insight Management and Consulting Services, Inc. ("Insight Management") (IINN and Insight Management are referred to collectively herein as the "Insight Defendants").

### THE PARTIES

1. Shift is a Florida corporation with its principal place of business at 7950 North West 53rd Street, Suite 337, Doral, Florida 33166.

2. Bawahab is domiciled in, and therefore a citizen of, Texas.

3. IINN is a Michigan corporation with its principal place of business at 4800 South Saginaw Street, Flint, Michigan 48507.

4. At all relevant times, Bawahab was IINN's Chief Strategy Officer.

5. Insight Management is a Michigan corporation with its principal place of business at 4800 South Saginaw Street, Flint, Michigan 48507.

6. At all relevant times, Bawahab was Insight Management's Chief Executive Officer.

**JURISDICTION AND VENUE**

7. This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(1) because there is diversity of citizenship and the amount in controversy exceeds $75,000, exclusive of interest, costs, and attorney's fees. More specifically:

(a) Shift is a citizen of Florida.

(b) Bawahab is a citizen of Texas.

(c) IINN and Insight Management are citizens of Michigan.

8. Defendants are subject to the personal jurisdiction of this Court because they have voluntarily subjected themselves to the jurisdiction of this Court and/or have purposefully availed themselves of the jurisdiction of this Court with respect to the specific transactions at issue. More specifically:

(a) In certain June 14, 2024 written agreements, which are relevant to the claims at issue in this action, Shift and Defendants acknowledged and agreed, *inter alia*, that (i) the agreements were "made in the State of Florida," (ii) "the State of Florida has a reasonable relationship to the transactions encompassed by [the agreements]," and (iii) "[a]ny litigation, whether sounding in contract, tort, law, equity, or otherwise, relating to [the agreements] or involving [Shift] on one side and [the Insight Defendants] or [Bawahab] on the other must be commenced and maintained in any court located in the Counties of Broward or Miami-Dade in the State of Florida."

(b) Defendants committed a tortious act in Florida by way of communications directed into Florida for the purpose of fraud.

9. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to this action occurred in this District.

**ALLEGATIONS RELATED TO ALL CLAIMS**

### I.   The Management Agreement

10.   On or about March 12, 2024, Insight Management entered into a Hospital Facilities Management Services Agreement (the "Management Agreement") with CarePoint Health Systems, Inc. and several of CarePoint Health Systems, Inc.'s subsidiaries (collectively, "CarePoint"), including the entities that owned and operated Bayonne Medical Center, Christ Hospital, and Hoboken University Medical Center.

11.   The Management Agreement provided that CarePoint would pay Insight Management $1.750 million per month to "manage and supervise all day-to-day operations of [CarePoint] Hospital Facilities" and provide related services. For example, Insight Management agreed to (a) "provide and manage all business functions and services related to the conduct of [CarePoint's business]" and (b) "be responsible for, managing all financial and operation functions related to the conduct of [CarePoint's business] . . ., including the discretion over all cash flow and funds."

12.   Bawahab signed the Management Agreement on behalf of Insight Management.

### II.   The June 2024 Agreement

13.   On June 14, 2024, Shift entered into a Standard Merchant Cash Advance Agreement (the "June 2024 Agreement") with CarePoint, the Insight Defendants, Insight Mobility, LLC and Insight Chicago, Inc. The June 2024 Agreement is attached hereto as **Exhibit A**.

14.   Bawahab signed the June 2024 Agreement on behalf of CarePoint, the Insight Defendants, Insight Mobility, LLC and Insight Chicago, Inc.

15.   Insight Mobility, LLC and Insight Chicago, Inc. are not parties to this action.

16. The June 2024 Agreement contemplated that Shift would pay $4,500,000.00 to acquire $6,840,000.00 of CarePoint's, the Insight Defendants', Insight Mobility, LLC's and Insight Chicago, Inc.'s future receivables.

17. Simultaneously with the execution of the June 2024 Agreement, Bawahab signed a Guarantee of Performance (the "Personal Guaranty") whereby he personally guaranteed "performance of all of the representations, warranties, and covenants" made by CarePoint, the Insight Defendants, Insight Mobility, LLC and Insight Chicago, Inc. to Shift.

18. Bawahab then directed Shift to send the purchase price to be paid under the June 2024 Agreement to an attorney escrow account presumably so it could be distributed to CarePoint, the Insight Defendants, Insight Mobility, LLC and/or Insight Chicago, Inc.

### III.   The Fraudulent Scheme

19. Within two weeks of signing the June 2024 Agreement, Bawahab knew that CarePoint was insolvent and likely to file for bankruptcy. Bawahab thus hatched a scheme to insulate himself from personal liability, and to protect the Insight Defendants from their payment obligations to Shift under the June 2024 Agreement.

20. Bawahab conspired with his friend and business associate, Omar Sharif Amanat ("Sharif") and the Insight Defendants' Chief Financial Officer Atiq Nakrawala ("Nakrawala"). By July 1, 2024, each of Bawahab, Sharif and Nakrawala knew that CarePoint: (a) was experiencing severe financial difficulties; (b) had limited cash flow; (c) was struggling to meet its payment obligations, including payroll; and (d) was planning to file bankruptcy.

21. Bawahab, Sharif and Nakrawala engaged in a text message exchange on July 1, 2024, during which they repeatedly emphasized the need to protect Bawahab personally and the Insight Defendants from liability by, among other things, signing a new agreement with Shift that did not include a personal guaranty, among other things.

4

22.    For example, on July 1, 2024, after discussing CarePoint's ongoing financial problems, Bawahab sent the following message to Nakrawala:

> [T]hey [CarePoint] need funds to make payroll. And idk if / when [another source of funding] will come[.] So we should situate ourselves asap liability wise if something goes down

23.    That same day, again after discussing CarePoint's dire financial situation, Bawahab exchanged the following messages with Sharif:

Bawahab:    How long would it take to put a prepack bankruptcy together[?]

Sharif:     Salaams. Probably 6 weeks

            Inshallah

. . .

Bawahab:    Idk if we have that much time

            Rich is saying they [CarePoint] need 8M this week

            For rent/payroll

Sharif:     🫢

            I can get it inshallah if we really need it. Might be worthwhile. Let's dowcusss [sic]

Bawahab:    Yes but we need to protect ourselves and secure

24.    The text messages among Bawahab, Sharif and Nakrawala reveal that there were three main objectives: (a) a new agreement to pay off (*i.e.*, eliminate) the Insight Defendants' obligations to Shift under the June 2024 Agreement; (b) none of the Insight-related entities were to be parties to the new agreement; and (c) the new agreement would not be secured by a personal guarantee.

5

25.     The first action taken in connection with Bawahab's scheme was to direct Sharif to contact Shift about entering into a new funding agreement to replace the June 2024 Agreement. Pursuant to that plan, Sharif did so on or about July 1, 2024.

26.     On July 3, 2024, following discussions among Sharif and representatives of Shift, Shift entered into a Standard Merchant Cash Advance Agreement (the "July 2024 Agreement") with CarePoint and Insight Chicago, Inc.[1] The July 2024 Agreement is attached hereto as **Exhibit B.**

27.     Bawahab signed the July 2024 Agreement on behalf of Insight Chicago and CarePoint.

28.     The July 2024 Agreement contemplated that Shift would pay $10,025,000.00 to acquire $15,679,100.00 of CarePoint's future receivables, but that $6,280,080.00 of the purchase price would be retained by Shift to satisfy both CarePoint's and the Insight Defendants' obligations under the June 2024 Agreement.

29.     At Bawahab's insistence, the July 2024 Agreement also did not include any personal guarantees.

30.     Put differently, as a result of the July 2024 Agreement, the obligations that the Insight Defendants owed to Shift under the June 2024 Agreement, which Bawahab had personally guaranteed, were effectively transferred to CarePoint and Insight Chicago, Inc.

31.     Bawahab directed Shift to send the purchase price to be paid under the July 2024 Agreement to an attorney escrow account presumably so it could be distributed to CarePoint and/or Insight Chicago, Inc.

---

[1] Shift is currently pursuing a claim for breach of the July 2024 Agreement against Insight Chicago, Inc. in a New York arbitration proceeding, where Insight Chicago, Inc. has denied liability based on, *inter alia*, the theory of unilateral and/or mutual mistake.

**IV.     The Fraudulent Misrepresentations**

32.     Section 25 of the July 2024 Agreement, which Bawahab signed on behalf of CarePoint, includes the following representation:

> [CarePoint] represents, warrants, and covenants that as of the date of this Agreement, it **does not contemplate and has not filed any petition for bankruptcy protection under Title 11 of the United States Code** and there has been no involuntary petition brought or pending against [CarePoint]. [CarePoint] further warrants that it **does not anticipate filing any such bankruptcy petition** and it does not anticipate that an involuntary petition will be filed against it. (emphasis added.)

33.     This representation was knowingly false when made.

34.     By virtue of the Management Agreement, which made Insight Management "responsible for, managing all financial and operation functions related to the conduct of [CarePoint's business] . . ., including the discretion over all cash flow and funds," Bawahab and the Insight Defendants had insider knowledge of CarePoint's financial condition such that Bawahab and the Insight Defendants knew that CarePoint was under financial stress and would file for bankruptcy soon after Bawahab signed the July 2024 Agreement on CarePoint's behalf.

35.     Indeed, just two days prior to signing the July 2024 Agreement, Bawahab and his business associates were openly discussing CarePoint's untenable financial situation and actively planning to put CarePoint into bankruptcy.

36.     Soon after signing the July 2024 Agreement, CarePoint breached that agreement, and then filed for bankruptcy in the United States Bankruptcy Court for the District of Delaware, Case No. 24-12534 (the "CarePoint Bankruptcy").

37.     Documents filed in the CarePoint Bankruptcy reveal that in July 2024, and perhaps even sooner, CarePoint was paying counsel for "prepetition services and expenses incurred . . . in connection with the preparation and commencement of [the CarePoint Bankruptcy]." CarePoint Bankruptcy, ECF No. 36-4.

38.     Section 22 of the July 2024 Agreement includes the following representation:

[CarePoint] represents, warrants, and covenants that it and each person signing this Agreement on behalf of [CarePoint] has full power and authority to incur and perform the obligations under this Agreement, all of which have been duly authorized.

39.     Upon information and belief, this representation was knowingly false when made.

Indeed, in documents filed in the CarePoint Bankruptcy, CarePoint has made clear that:

Mr. Bawahab did not have the authority to incur debt to Shift Capital Inc. on behalf of [CarePoint] under the [Management Agreement], nor did he obtain such authority from [CarePoint's] Board of Trustees.

CarePoint Bankruptcy, ECF No. 744.

40.     In another filing in the CarePoint Bankruptcy, CarePoint also asserts that:

[I]n exchange for the [Management Agreement], [Insight Management] took additional [merchant cash advances] out to refinance the [merchant cash advances received by CarePoint prior to the Management Agreement] off CarePoint's books. CarePoint is not aware of any [merchant cash advances] remaining on its books. CarePoint believes the [merchant cash advances] have balances remaining which have been assumed by [Insight Management] and that CarePoint is not responsible for the repayment of these [merchant cash advances].

CarePoint Bankruptcy, ECF No. 1131.

## FIRST COUNT
### (Fraudulent Inducement - Bawahab)

41.     Shift repeats and realleges each of the allegations contained in the paragraphs above as if fully set forth herein.

42.     The representations set forth in paragraphs 32 and 38 of this Amended Complaint (the "Fraudulent Misrepresentations") were false.

43.     At the time he made the Fraudulent Misrepresentations, Bawahab knew the Fraudulent Misrepresentations were false.

44.     The Fraudulent Misrepresentations concerned material facts.

8

45. Bawahab made the Fraudulent Misrepresentations for the purpose of inducing Shift to enter, and perform on, the July 2024 Agreement.

46. Shift relied on the Fraudulent Misrepresentations to its detriment.

47. But not for the Fraudulent Misrepresentations, Shift would not have entered into the July 2024 Agreement.

48. As a direct and proximate result of the Fraudulent Misrepresentations, Shift sustained monetary damages in an amount not less $14,439,812.00.

### SECOND COUNT
### (Civil Conspiracy)

49. Shift repeats and realleges each of the allegations contained in the paragraphs above as if fully set forth herein.

50. Defendants, acting in concert with each other and with Sharif and Nakrawala, agreed and combined to induce Shift to replace the June 2024 Agreement with the July 2024 Agreement in order to transfer and eliminate the Insight Defendants' and Bawahab's obligations to Shift. Their coordinated plan included (a) having Sharif approach Shift to replace the June 2024 Agreement; (b) not including the Insight Defendants as parties to the July 2024 Agreement; and (c) eliminating Bawahab's personal guaranty.

51. The conspirators agreed the objective would be accomplished through the unlawful act of fraudulent inducement – namely, procuring Shift's execution and performance of the July 2024 Agreement by means of false representations and concealment concerning (a) CarePoint's intent and plans regarding bankruptcy; and (b) the authority of the signatory to bind CarePoint under the July 2024 Agreement.

52. In furtherance of the conspiracy, Defendants committed overt acts, including:

(a)     Directing Sharif to approach Shift to replace the June 2024 Agreement and coordinating terms designed to remove the Insight Defendants and any guaranty exposure.

(b)     Negotiating and executing the July 2024 Agreement while representing that CarePoint did not contemplate or anticipate bankruptcy, despite contemporaneous planning for a "prepack" and recognition of an immediate cash crisis and impending filing.

(c)     Representing that the signatory had full power and authority to bind CarePoint, despite CarePoint's later assertion that Bawahab lacked such authority and had no Board approval.

(d)     Directing Shift to fund the transaction to an attorney escrow account for distribution, thereby effectuating the payoff and release of the Insight Defendants' and Bawahab's prior obligations.

53.     Defendants, acting in concert, made material false statements and omissions to induce Shift to enter and perform under the July 2024 Agreement, including:

(a)     The express representation that CarePoint did not contemplate, anticipate, or have any pending bankruptcy, which was false given contemporaneous discussions of a prepack, severe liquidity distress, and payment of counsel for prepetition bankruptcy services.

(b)     The representation of authority to incur and perform obligations under the July 2024 Agreement, which was false per CarePoint's position that Bawahab lacked authority and Board approval.

54.     Shift would not have entered the July 2024 Agreement but for these misrepresentations and relied on them to its detriment.

55.     Defendants specifically intended to injure Shift by transferring and eliminating the Insight Defendants' and Bawahab's exposure under the June 2024 Agreement and the Personal Guaranty, while inducing Shift to fund a larger transaction exposed to CarePoint's imminent default and bankruptcy risk, as shown by contemporaneous messages emphasizing the need to "situate ourselves asap liability wise" and to "protect ourselves and secure" via a new agreement with Shift.

56.     By virtue of the Personal Guaranty, Bawahab had an independent, personal stake in replacing the June 2024 Agreement with the July 2024 Agreement, and he stood to benefit personally from making the Fraudulent Misrepresentations to induce Shift to enter, and perform on, the July 2024 Agreement.

57.     As a direct and proximate result of the conspirators' conduct, Shift sustained monetary damages in an amount not less than $14,439,812.00.

58.     Shift is entitled to recover damages, together with such further relief as the Court deems just and proper.

## THIRD COUNT
### (Unjust Enrichment – In the Alternative)

59.     Shift repeats and realleges each of the allegations contained in the paragraphs above as if fully set forth herein.

60.     By entering into the July 2024 Agreement, Shift conferred benefits on Defendants in that, *inter alia*, (a) the Insight Defendants were released from $6,280,080.00 in payment obligations under the June 2024 Agreement; (b) Bawahab was released from his obligations under the Personal Guaranty; and (c) Shift transferred $2,005,952.00 to the Insight Defendants pursuant to the July 2024 Agreement.

11

61.     Shift conferred those benefits on Defendants without knowledge of material facts. More specifically, at the time it conferred those benefits on Defendants, Shift did not know that CarePoint was preparing to file for bankruptcy or that Bawahab lacked authority to sign the July 2024 Agreement on behalf of CarePoint.

62.     Defendants were aware they were receiving a benefit from Shift, and Defendants voluntarily accepted and retained those benefits.

63.     Under the circumstances, it would be inequitable for Defendants to retain the benefits without first paying Shift for the value of the benefits.

64.     Shift is entitled to recover no less than $8,286,032.00 from Defendants.

**PRAYER FOR RELIEF**

65.     Wherefore, Shift demands judgment against Defendants, jointly and severally:

(a)     awarding Shift $14,439,812.00, plus interest, costs and attorneys' fees;

(b)     in the alternative, awarding Shift $8,286,032.00, plus interest, costs and attorneys' fees; and

(c)     awarding Shift other relief this Court deems just and proper.

Dated: April 27, 2026

Respectfully submitted,

**POLSINELLI PC**
By: */s/ Marx P. Calderón*
Michelle G. Bernstein
Florida Bar No. 1030736
Marx P. Calderón
Florida Bar No. 1065228
315 S. Biscayne Blvd., Suite 400
Miami, FL 33131
Telephone: (305) 921-1800
mbernstein@polsinelli.com
mcalderon@polsinelli.com

12