UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

SHIFT CAPITAL, INC.

      Plaintiff,

vs.

ATIF BAWAHAB, IINN, INC., and
INSIGHT MANAGEMENT AND
CONSULTING SERVICES, INC.,

      Defendants.

Case No: 26-cv-20943-BB

_____

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION
<u>TO DEFENDANTS' MOTION TO DISMISS FIRST AMENDED COMPLAINT</u>**

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 1

BACKGROUND FACTS ........................................................................................................... 3

LEGAL ARGUMENT ................................................................................................................ 6

      I.      Legal Standard ............................................................................................. 6

      II.      The Complaint States a Claim for Fraudulent Inducement ................................... 7

      III.      The Complaint States a Claim for Civil Conspiracy .............................................. 9

      IV.      The Complaint States a Claim for Unjust Enrichment ......................................... 13

CONCLUSION ........................................................................................................................ 15

i

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Adventist Health Sys. Sunbelt Healthcare Corp. v. Michael H. Weiss P.C*,
   No. 6:20-cv-877-Orl-40DCI, 2021 WL 1238321 (M.D. Fla. Feb. 22, 2021)..........................11

*Apex Toxicology, LLC v. United Healthcare Servs.*,
   No. 17-61840-CIV, 2020 WL 13551299 (S.D. Fla. July 7, 2020) ..........................................12

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)...................................................................................................................6

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007)...................................................................................................................6

*Brooks v. Blue Cross & Blue Shield of Fla., Inc.*,
   116 F.3d 1364 (11th Cir. 1997) ................................................................................................6

*Central Magnetic Imaging Open MRI of Plantation, Ltd. v. State Farm Mut. Auto
   Ins. Co.*,
   789 F. Supp. 2d 1311 (S.D. Fla. 2011) ...................................................................................14

*Charles v. Fla. Foreclosure Placement Ctr., LLC*,
   988 So. 2d 1157 (Fla. 3d DCA 2008) ..................................................................................9, 11

*Degutis v. Fin. Freedom, LLC*,
   978 F. Supp. 2d 1243 (M.D. Fla. 2013).................................................................................14

*Fixel v. Rosenthal & Rosenthal, Inc.*,
   842 So. 2d 204 (Fla. 3d DCA 2003) .........................................................................................7

*Frayman v. Douglas Elliman Realty, LLC*,
   515 F. Supp. 3d 1262 (S.D. Fla. 2021) ..................................................................................6, 7

*Hopper v. Solvay Pharms., Inc.*,
   588 F.3d 1318 (11th Cir. 2009) ................................................................................................7

*Marrache v. Bacardi U.S.A., Inc.*,
   17 F.4th 1084 (11th Cir. 2021) ...............................................................................................13

*Mizzaro v. Home Depot, Inc.*,
   544 F.3d 1230 (11th Cir. 2008) ................................................................................................8

*Otto Candies, LLC v. Citigroup Inc.*,
   137 F.4th 1158 (11th Cir. 2025), ..........................................................................................9, 10

*Pearlman v. Millenium Exec. Realty, Inc.*,
  No. 09-81221-civ-Hurley/Hopkins, 2010 WL 11504277
  (S.D. Fla. May 7, 2010) ...............................................................................................13, 14

*Raimi v. Furlong*,
  702 So. 2d 1273 (Fla. 3d DCA 1997) .......................................................................................9

*RKR Motors, Inc. v. Perez*,
  No. 23-60819-CIV, 2024 WL 5103639 (S.D. Fla. Nov. 4, 2024) ............................................11

*Rustik Haws, LLC v. Identiqa Sols. Co.*,
  No. 8:21-CV-00565-MSS-AEP, 2025 WL 470225 (M.D. Fla. Feb. 12, 2025).......................13

*Schmidlin v. Raymond James Fin., Inc.*,
  No. 8:24-cv-2041-KKM-CPT, 2026 WL 847197 (M.D. Fla. Mar. 27, 2026).........................14

*Sea Shelter IV, LLC v. TRG Sunny Isles V, Ltd.*,
  No. 08-21767-Civ, 2009 WL 692469 (S.D. Fla. Mar. 17, 2009) ..............................................7

*SEC v. ESM Grp., Inc.*,
  835 F.2d 270 (11th Cir. 1988) ..................................................................................................6

*Sonic Momentum B, LP v. Motorcars of Distinction, Inc.*,
  2011 WL 4738190 (S.D. Fla. Oct. 7, 2011)..............................................................................11

*Wilson v. EverBank, N.A.*,
  77 F. Supp. 3d 1202 (S.D. Fla. 2015) .....................................................................................14

Plaintiff Shift Capital, Inc. ("Shift") respectfully submits this Memorandum of Law in opposition to the Motion to Dismiss filed by defendants Atif Bawahab ("Bawahab"), IINN, Inc. ("IINN"), and Insight Management and Consulting Services, Inc. ("Insight Management," and together with IINN, the "Insight Defendants") [Dkt. 23] (the "Motion").

## PRELIMINARY STATEMENT[1]

Shift commenced this action after discovery in another proceeding revealed that Defendants conspired to defraud Shift out of millions of dollars. Shift's First Amended Complaint (the "Complaint" or "FAC") describes in detail the scheme Bawahab and his cohorts hatched to insulate Defendants from liability, to defraud Shift, and enrich themselves at Shift's expense.

Defendants filed a Motion seeking pre-answer dismissal on the basis that the Complaint is deficient under Rule 9(b)'s heightened pleading standard. Defendants' arguments fail on their face. Count I, for fraudulent inducement, identifies the speaker, the written representations, the date and document in which they were made, why they were false, how Shift was misled, and how Shift was damaged. Count II, for civil conspiracy, identifies the conspirators, the July 1, 2024 text messages that reveal the objective and timing of the agreement, the overt acts in furtherance of the agreement, and the resulting fraud on Shift. And Count III is an alternative equitable claim against Defendants who are not parties to the July 2024 Agreement but nevertheless benefited as a result, and against whom Shift has no breach-of-contract remedy.

Defendants' Motion should be denied in its entirety. As to the fraud claim, Defendants isolate one allegation concerning insider knowledge and then argue that Shift did not explain how the fraud was accomplished. Defendants ignore the well pled allegations in the Complaint that

---

[1] Capitalized terms not otherwise defined in this Preliminary Statement have the meanings ascribed to them *infra*.

explain how the fraud was accomplished: Bawahab and the Insight Defendants had millions of dollars in exposure to Shift to cover CarePoint's obligations under the June 2024 Agreement, learned that CarePoint was in severe financial distress and likely to file bankruptcy, hatched a scheme to obtain replacement financing that would insulate Defendants from liability, and executed on that scheme by inducing Shift into a replacement transaction -- the July 2024 Agreement -- that removed the Insight Defendants and Bawahab's personal guaranty. The July 2024 Agreement, which Bawahab executed on behalf of CarePoint, contained two false written representations that Bawahab knew were false when made. Shift reasonably relied on those written representations, and funded the transaction that paid off $6,280,080.00 in obligations owed under the June 2024 Agreement. Unbeknownst to Shift, Shift funded that transaction while CarePoint was insolvent or on the brink of insolvency, and was exposed to CarePoint's imminent bankruptcy without the recourse against the Insight Defendants or Bawahab that it had under the June 2024 Agreement. *See* FAC ¶¶ 19-32, 38-40, 60. The Complaint quotes text messages and identifies two false written representations that Bawahab made to Shift *in writing*, which together clearly provide the 'who, what, when, where and how' of the fraudulent scheme.

Indeed, this is not a case where Shift merely suspects fraud and is hoping that discovery will reveal some evidence of misconduct. Nor are Shift's fraud claims based on unsupported, conclusory allegations as to what Defendants may have known and should have disclosed. The Complaint's allegations describe in detail Bawahab's and his co-conspirators' own words to establish what they knew, when they knew it, and the false statements they made to Shift to induce Shift into executing the July 2024 Agreement. Defendants' suggestion that the allegations in the Complaint lack the requisite specificity ignores the well-pled allegations in the Complaint and borders on frivolous.

Defendants' argument in support of dismissing Shift's unjust enrichment claim is no better. There is no contractual relationship between Shift and any of the Defendants, and Shift's agreement with non-parties does not provide Shift with a contractual remedy against the Defendants who were unjustly enriched at Shift's expense. Florida law is clear that under these circumstances, Shift can pursue its alternative claim for unjust enrichment.

Based on the foregoing and as more fully set forth herein, Shift respectfully submits that the Motion should be denied in its entirety.

## BACKGROUND FACTS

On or about March 12, 2024, Insight Management entered into a Hospital Facilities Management Services Agreement (the "Management Agreement") with CarePoint Health Systems, Inc. and several of CarePoint Health Systems, Inc.'s subsidiaries (collectively, "CarePoint"). *See* FAC ¶ 10. Pursuant to the Management Agreement, Insight Management agreed, among other things, to manage all of CarePoint's "financial and operation functions." *Id.* ¶ 11. Bawahab, Insight Management's Chief Executive Officer, signed the Management Agreement on its behalf. *See id.* ¶¶ 6, 12.

On June 14, 2024, Shift entered into a Merchant Agreement with CarePoint, the Insight Defendants, and non-parties Insight Mobility, LLC and Insight Chicago, Inc. (the "June 2024 Agreement"). *See id.* ¶ 13; *id.* Ex. A. Bawahab signed the June 2024 Agreement on behalf of CarePoint, the Insight Defendants, Insight Mobility, and Insight Chicago. FAC ¶ 14; *id.* Ex. A. The June 2024 Agreement contemplated that Shift would pay $4,500,000.00 to acquire $6,840,000.00 of CarePoint's, the Insight Defendants', Insight Mobility, LLC's and Insight Chicago's future receivables. FAC ¶ 16. Bawahab personally guaranteed performance of the merchants' representations, warranties, and covenants. *Id.* ¶ 17.

3

Within two weeks, it was apparent that CarePoint was insolvent and likely to file bankruptcy. *See id.* ¶ 19. Bawahab was are of CarePoint's dire financial condition, and conspired with his friends and business associates Omar Sharif Amanat ("Sharif") and Atiq Nakrawala ("Nakrawala"), the Insight Defendants' Chief Financial Officer, to obtain replacement financing and insulate the Insight Defendants and Bawahab from liability. *Id.* ¶ 20. In a July 1, 2024 text chain, Bawahab, Sharif, and Nakrawala discussed CarePoint's severe financial difficulties, its limited cash flow, that it was struggling to meet payroll and other payment obligations, its plans to file for bankruptcy, and the need to "situate" Bawahab and the Insight Defendants to avoid liability. *See id.* ¶ 21.

The FAC quotes those contemporaneous text messages. After discussing CarePoint's financial problems, on July 1, 2024, Bawahab told Nakrawala that "we should situate ourselves asap liability wise if something goes down." FAC ¶ 22. That same day, Bawahab asked Sharif, "How long would it take to put a prepack bankruptcy together[?]" *Id.* ¶ 23. After Sharif estimated six weeks, Bawahab responded that he did not know whether they had that much time because CarePoint needed $8 million that week for rent and payroll. *Id*. When Sharif suggested he could obtain money, Bawahab responded: "Yes but we need to protect ourselves and secure." *Id*. That money would come from Shift. Bawahab authorized Sharif to pursue the additional funding but again emphasized the "need to protect ourselves and secure" (*id.* ¶ 23) – i.e.., avoid a situation whereby Bawahab and the Insight Defendants would be liable to Shift for the insolvent CarePoint's obligations.

The FAC alleges that the text messages among Bawahab, Sharif and Nakrawala reveal three objectives: (1) use a new agreement to pay off and eliminate the Insight Defendants' obligations to Shift under the June 2024 Agreement; (2) keep the Insight Defendants out of the

new agreement; and (3) eliminate Bawahab's personal guaranty. FAC ¶ 24. On or about July 1, 2024, Bawahab directed Sharif to contact Shift about entering into a new funding agreement to replace the June 2024 Agreement, and Sharif did so. *Id.* ¶ 25.

Almost immediately after this exchange, Sharif took action to effectuate the parties' agreement to insulate Defendants and to defraud Shift. Sharif contacted Shift to suggest a funding arrangement that would (1) involve CarePoint, but not the Insight Defendants; (2) not include any personal guaranties; and (3) replace (*i.e.*, pay off) the June 2024 Agreement. *Id.* ¶¶ 24-30. A few days later, on July 3, 2024, Shift and CarePoint entered into that new agreement (the "July 2024 Agreement"), which Bawahab signed on behalf of CarePoint and Insight Chicago, Inc. *Id.* ¶¶ 26-27; *id.* Ex. B. The July 2024 Agreement contemplated that Shift would pay $10,025,000.00 to acquire $15,679,100.00 of CarePoint's future receivables, but that $6,280,080.00 of the purchase price would be retained by Shift to satisfy both CarePoint's and the Insight Defendants' obligations under the June 2024 Agreement. FAC ¶ 28. At Bawahab's insistence, the July 2024 Agreement did not include any personal guaranties. *Id.* ¶ 29. In substance, the July 2024 Agreement transferred to CarePoint -- an entity Bawahab knew to be insolvent and on the brink of bankruptcy -- and Insight Chicago the obligations that the Insight Defendants previously owed to Shift and that Bawahab had personally guaranteed. *Id.* ¶ 30.

Critically, the July 2024 Agreement included two false representations. Section 25 represented that CarePoint did not contemplate bankruptcy, had not filed a bankruptcy petition, and did not anticipate filing one. *Id.* ¶ 32; id. Ex. B § 25. Section 22 represented that CarePoint and each person signing on CarePoint's behalf had full power and authority to incur and perform the obligations under the agreement, all of which had been duly authorized. FAC ¶ 38; *id.* Ex. B § 22. The FAC alleges that both representations were false when made, that Bawahab knew they

were false, and that he made those representations to induce Shift to enter into and perform under the July 2024 Agreement. FAC ¶¶ 33-40, 42-48.

The FAC also pleads why the representations were false. Just two days before the July 2024 Agreement was signed, Bawahab and his associates were discussing CarePoint's immediate cash crisis and a prepackaged bankruptcy. *Id.* ¶¶ 22-23, 35. And soon after the July 2024 Agreement was signed, CarePoint filed for bankruptcy. *Id.* ¶ 36. Bankruptcy filings reflect that in July 2024, and perhaps even earlier, CarePoint was paying counsel for prepetition services and expenses connected to the preparation and commencement of the bankruptcy. *Id.* ¶ 37. CarePoint also later asserted in the bankruptcy case that Bawahab lacked authority to incur the debt to Shift on CarePoint's behalf and did not obtain Board approval. *Id.* ¶ 39.

The FAC specifically pleads the foregoing facts. As set forth herein, those allegations amply suffice to state cognizable cause of action against each of the Defendants.

## LEGAL ARGUMENT

### I.      Legal Standard

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "When considering a motion to dismiss, a court must construe the complaint in the light most favorable to the plaintiff and take its factual allegations as true." *Frayman v. Douglas Elliman Realty, LLC*, 515 F. Supp. 3d 1262, 1277 (S.D. Fla. 2021) (citing *Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1369 (11th Cir. 1997) (citing *SEC v. ESM Grp., Inc.*, 835 F.2d 270, 272 (11th Cir. 1988)).

Rule 9(b) requires a party alleging fraud to state the circumstances constituting fraud with particularity. *See* Fed. R. Civ. P. 9(b). "A complaint satisfies Rule 9(b) by providing 'facts as to

6

time, place, and substance of the defendant's alleged fraud, specifically the details of the defendants' allegedly fraudulent acts, when they occurred, and who engaged in them.'" *Frayman*, 515 F. Supp. 3d at 1277 (quoting *Hopper v. Solvay Pharms., Inc.*, 588 F.3d 1318, 1324 (11th Cir. 2009) (quotation marks and citation omitted)). "When considering a motion to dismiss, a court must construe the complaint in the light most favorable to the plaintiff and take its factual allegations as true." *Id.*

Applying these standards, each of the causes of action in the Complaint readily withstands the Motion.

## II.      The Complaint States a Claim for Fraudulent Inducement

To state a claim for fraudulent inducement, "a plaintiff must allege (1) a misrepresentation of a material fact; (2) knowledge by the person making the statement that the representation is false; (3) intent by the person making the statement that the representation would induce another to rely and act on it; and (4) that the plaintiff suffered injury in justifiable reliance on the representation." *Frayman*, 515 F. Supp. 3d at 1281 (quoting *Sea Shelter IV, LLC v. TRG Sunny Isles V, Ltd.*, No. 08-21767-Civ, 2009 WL 692469, at *5 (S.D. Fla. Mar. 17, 2009) (citing *Fixel v. Rosenthal & Rosenthal, Inc.*, 842 So. 2d 204, 209 (Fla. 3d DCA 2003)).

The Complaint alleges each of those elements. It identifies the precise misrepresentations: the Section 25 no-bankruptcy representation and the Section 22 authority representation in the July 2024 Agreement. *See* FAC ¶¶ 32, 38; *id.* Ex. B §§ 22, 25. It identifies the speaker and time: Bawahab signed the July 2024 Agreement on July 3, 2024, on behalf of CarePoint and Insight Chicago. *See* FAC ¶¶ 26-27. It identifies why the statements were false: Bawahab and his associates had just discussed CarePoint's dire liquidity problems and a prepackaged bankruptcy, CarePoint soon filed bankruptcy, bankruptcy filings reflected prepetition bankruptcy work in July

2024 or earlier, and CarePoint later stated that Bawahab lacked authority and Board approval to incur the debt. *See id.* ¶¶ 22-23, 35-40. And it alleges that Shift was misled: Shift entered and performed under the July 2024 Agreement in reliance on the false written representations regarding Bawahab's authority and CarePoint's financial condition, and was damaged as a result. *See id.* ¶¶ 45-48.

Defendants' principal argument in the Motion is that Shift did not identify what "insider knowledge" Bawahab supposedly obtained from the Management Agreement. *See* Mtn. at 4. That argument misstates the claim. The fraudulent inducement claim is not based on a conclusory inference from the Management Agreement alone. Instead, it is predicated on Bawahab's actual contemporaneous knowledge of CarePoint's insolvency, as described in his own July 1, 2024 text messages: he discussed a prepackaged bankruptcy, stated that CarePoint needed $8 million that week for rent and payroll, and emphasized the need for him and the Insight Defendants to "protect [them]selves" from liability through replacement financing from Shift. *See* FAC ¶¶ 22-25. That he was discussing those issues with Nakrawala, the Insight Defendants' Chief Financial Officer, confirms the intent to "protect" the Insight Defendants. Rule 9(b) permits knowledge to be alleged generally, *see Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1237 (11th Cir. 2008), and the FAC pleads far more than a general allegation of knowledge.

Indeed, Defendants seem to suggest that this Court should ignore the allegations detailing Bawahab's text messages, which evidence Bawahab's knowledge of CarePoint's dire financial condition, and instead focus on whether Bawahab *could have* known about those problems in the first place. Defendants' approach is akin to arguing that a suspect caught red-handed holding a smoking gun cannot be charged with murder unless the police can determine how the killer obtained the weapon. Shift respectfully submits that quoting Bawahab's own statements about

8

CarePoint's financial problems and potential bankruptcy is sufficient to allege that Bawahab knew about CarePoint's financial problems and potential bankruptcy. And Bawahab's representation in Section 25 of the July 2024 Agreement that CarePoint was not on the brink of bankruptcy was knowingly false when made.

Defendants also ignore the second written misrepresentation. Section 22 of the July 2024 Agreement represented that CarePoint and each person signing on CarePoint's behalf had full power and authority to incur and perform the obligations under the agreement. FAC ¶ 38. The FAC alleges that this was false; CarePoint later stated in the bankruptcy case that Bawahab lacked authority under the Management Agreement and lacked Board approval to incur debt to Shift on CarePoint's behalf. *See* FAC ¶ 39. That authority representation is independently sufficient to support Count I at the pleading stage.

### III.    The Complaint States a Claim for Civil Conspiracy

A Florida civil conspiracy claim requires allegations of: (1) an agreement between two or more parties; (2) to do an unlawful act or a lawful act by unlawful means; (3) an overt act in pursuance of the conspiracy; and (4) damages. *Otto Candies, LLC v. Citigroup Inc.*, 137 F.4th 1158, 1204 (11th Cir. 2025), *cert. denied*, 223 L. Ed. 2d 508 (Jan. 12, 2026) (quoting *Raimi v. Furlong*, 702 So. 2d 1273, 1284 (Fla. 3d DCA 1997)). "Each coconspirator need not act to further a conspiracy; each need only know of the scheme and assist in it in some way to be held responsible for all of the acts of his coconspirators." *Id.* (quoting *Charles v. Fla. Foreclosure Placement Ctr., LLC*, 988 So. 2d 1157, 1160 (Fla. 3d DCA 2008) (quotation omitted)).

Rule 9(b) governs the Plaintiff's fraud claims. *Id.* However, a plaintiff is not required to plead the exact words, minute, and place of the conspirators' agreement. An agreement may be

9

inferred from circumstantial facts, acts in furtherance of the common objective, and the Defendants' financial incentives. *See Otto Candies*, 137 F.4th at 1205.

Here, the Complaint pleads the agreement, its timing, the overt acts taken pursuant to the agreement, and that Shift was damaged as a result. By July 1, 2024, Bawahab, Sharif, and Nakrawala knew that CarePoint was in severe financial distress, struggling to meet payroll, and planning bankruptcy. *See* FAC ¶¶ 20-21. That same day, Bawahab told Nakrawala that they needed to "situate [them]selves asap liability wise if something goes down," and instructed Sharif to take action to protect Bawahab and the Insight Defendants from liability. *See id.* ¶¶ 22-23. The FAC then identifies the objectives of the agreement: replace the June 2024 Agreement, exclude the Insight Defendants from the new agreement, and eliminate personal guaranty exposure. *See id.* ¶ 24. Sharif took that directive and immediately contacted Shift about the replacement transaction, and the July 2024 Agreement was signed on July 3. *See id.* ¶¶ 25-27. These allegations identify the relevant circumstantial facts, common objective, financial incentives, and overt acts that formed the basis of the agreement and the implementation of the nefarious plan.

Defendants challenge the "when" element of the claim. *See* Mtn. at 5. That argument ignores the allegations that the agreement was formed through the July 1, 2024 text exchange, when the co-conspirators discussed CarePoint's bankruptcy timeline, immediate cash needs, and the need to obtain financing and protect themselves from liability. The overt acts occurred immediately thereafter, including through the false representations in the July 2024 Agreement which induced Shift to provide the replacement financing and forego the protections in the June 2024 Agreement, including the personal guaranty from Bawahab. *See* FAC ¶¶ 20-31. Rule 9(b) does not require Shift to allege the precise moment when the conspirators reached an unlawful understanding, particularly where the FAC quotes the contemporaneous communications

10

revealing the objective and implementation of the plan. Indeed, "a plaintiff does not need to 'allege the terms of the agreement, when it was entered, what benefit [a defendant] expected to obtain from the conspiracy, or other particularities,' as long as the plaintiff pleads 'facts which raise a reasonable expectation that discovery will reveal evidence of the agreement.'" *RKR Motors, Inc. v. Perez*, No. 23-60819-CIV, 2024 WL 5103639, at *6 (S.D. Fla. Nov. 4, 2024) (quoting *Sonic Momentum B, LP v. Motorcars of Distinction, Inc.*, 2011 WL 4738190, at *5 (S.D. Fla. Oct. 7, 2011) (denying motion to dismiss conspiracy claim where the plaintiff alleged that one defendant assisted in unlawfully converting vehicles by preparing and filing false documents and conducting sham auctions at which another co-conspirator purchased the vehicle, even though the terms of the underlying agreement were not alleged in detail); *see Adventist Health Sys. Sunbelt Healthcare Corp. v. Michael H. Weiss P.C*, No. 6:20-cv-877-Orl-40DCI, 2021 WL 1238321, at *7 (M.D. Fla. Feb. 22, 2021) (applying the same rule and denying motion to dismiss).

The Complaint also does not impermissibly lump Defendants together, as Defendants assert. *See* Mtn. at 6. Count II's use of the defined term "Defendants" follows detailed allegations as to each co-conspirator's individual role in the conspiracy, their communications they made with each other, and the overt acts taken in furtherance of the conspiracy, including that the text messages included the Insight Defendants' CFO and that Bawahab acted for himself and for the Insight Defendants, which could act only through their officers and agents. Under Florida law, "[e]ach coconspirator need not act to further a conspiracy; each need only know of the scheme and assist in it in some way to be held responsible for all of the acts of his coconspirators." *Charles v. Fla. Foreclosure Placement Ctr., LLC*, 988 So. 2d 1157, 1160 (Fla. 3d DCA 2008) (internal quotation marks and citation omitted) (reversing grant of motion to dismiss civil conspiracy and fraud claims arising out of concerted effort to defraud plaintiff out of equity in her home). The

11

FAC alleges that each of the Defendants knew the scheme, assisted it, and benefited from it. *See* FAC ¶¶ 24, 28-30, 50-56, 60.

Defendants rely upon *Apex Toxicology*, which does not help them. There, the court was unable to assess the nature of each Defendant's participation in the alleged scheme, and rejected the notion that it could plausibly infer that all were part of the conspiracy by the mere fact of their corporate affiliation. *See Apex Toxicology, LLC v. United Healthcare Servs.*, No. 17-61840-CIV, 2020 WL 13551299, at *4 (S.D. Fla. July 7, 2020). Here, in contrast, this case centers around actions taken by Bawahab for his own benefit and for the benefit of the Insight Defendants as their executive officer, pursuant to a plan Bawahab hatched with Nakrawala, the Insight Defendants' CFO.

Defendants' suggestion that the Complaint "lumps" them together to such an extent that they are unable to determine their respective roles in the conspiracy is disingenuous. *See* Mtn. at 6. The Complaint makes clear that Bawahab and Nakralawa were officers of the Insight Defendants, and that Bawahab participated in the conspiracy for his own personal benefit and for the benefit of those entities. The Complaint also makes clear that the actions the Insight Defendants took in furtherance of conspiracy were performed by Bawahab, in conjunction with non-party co-conspirators Sharif and Nakrawala. It is no way contradictory for Shift to detail Bawahab's specific acts in certain paragraphs of the Complaint and then subsequently use the term "Defendants" to convey that he performed those acts both for himself and on behalf of the Insight Defendants. Yet, Defendants feign confusion and imply that Shift's allegations regarding Bawahab's activities somehow obfuscate the role that the Insight Defendants played in the fraud.

The allegations in the Complaint clearly express "who" was involved in the conspiracy. First, Bawahab learned that CarePoint was experiencing a financial crisis and was facing

12

bankruptcy. *See* FAC ¶¶ 19-23. After realizing that if CarePoint went bankrupt, Insight Management, IINN, and possibly Bawahab personally would be responsible for satisfying the remaining payment obligations to Shift under the June 2024 Agreement, Bawahab advised Nakrawala of the need to "situate *ourselves* asap liability wise if something goes down." *Id.* ¶¶ 19-22 (emphasis added). Bawahab expressed his concern to Sharif and authorized Sharif to secure new funding from Shift while simultaneously emphasizing the need to "protect ourselves". *Id.* ¶¶ 23-26. Finally, Bawahab made multiple misrepresentations to induce Shift to enter into and perform under the July 2024 Agreement, which effectively transferred Insight Management and IINN's obligations and liability under the June 2024 Agreement to CarePoint, and eliminated Bawahab's personal guaranty altogether. That is more than sufficient for each Defendant to assess their involvement in the scheme.

## IV. The Complaint States a Claim for Unjust Enrichment

Under Florida law, a claim for unjust enrichment has three elements: (1) the plaintiff has conferred a benefit on the defendant, (2) the defendant voluntarily accepted and retained that benefit, and (3) the circumstances are such that it would be inequitable for the defendants to retain the benefit without paying its value. *See Marrache v. Bacardi U.S.A., Inc.*, 17 F.4th 1084 (11th Cir. 2021). Generally, "where there is an express contract between the parties, claims arising out of that contractual relationship will not support a claim for unjust enrichment." *Pearlman v. Millenium Exec. Realty, Inc.*, No. 09-81221-civ-Hurley/Hopkins, 2010 WL 11504277, at *3, 2010 U.S. Dist. LEXIS 151726 at *7 (S.D. Fla. May 7, 2010) (citations omitted). "However, an unjust enrichment claim against defendants who were *not* parties to the express contract can survive because there is no 'adequate legal remedy against [these] defendants.'" *Rustik Haws, LLC v.*

13

*Identiqa Sols. Co.,* No. 8:21-CV-00565-MSS-AEP, 2025 WL 470225, at \*12 (M.D. Fla. Feb. 12, 2025) (quoting *Pearlman*, 2010 WL 11504277, at \*3)).

Defendants' argument that the unjust-enrichment claim should be dismissed rests on the flawed premise that the July 2024 Agreement bars any equitable claim because Shift does not challenge the agreement's validity. Florida law does not apply the express-contract bar so broadly.[2] Here, Shift does not have a contract with any of the Defendants, nor does it have any contract remedies available from them. The July 2024 Agreement was between Shift, CarePoint, and Insight Chicago, Inc.; IINN and Insight Management were deliberately left out, and Bawahab signed only in a representative capacity for CarePoint and Insight Chicago. FAC ¶¶ 26-30; FAC Ex. B. Thus, the July 2024 Agreement does not give Shift a breach-of-contract remedy against the Defendants who moved to dismiss. The very point of the alleged scheme was to confer benefits on Bawahab and the Insight Defendants while removing them from the contract documents.

Count III also identifies benefits that are not remedied by a breach claim under the July 2024 Agreement: the Insight Defendants were released from $6,280,080.00 in payment obligations under the June 2024 Agreement; Bawahab was released from obligations under the personal

---

[2] The cases defendants cite in the Motion stand for the unremarkable proposition that a plaintiff cannot pursue the equitable remedy of unjust enrichment where that plaintiff has, or could, pursue a claim at law for breach of contract against the defendant. *See* Mtn. at 8 (citing *Wilson v. EverBank, N.A.*, 77 F. Supp. 3d 1202 (S.D. Fla. 2015) (valid mortgage agreements governed subject of borrowers' dispute, precluding borrowers' unjust enrichment claim against mortgage lender and/or loan servicer); *Schmidlin v. Raymond James Fin., Inc.*, No. 8:24-cv-2041-KKM-CPT, 2026 WL 847197 (M.D. Fla. Mar. 27, 2026) (unjust enrichment claim precluded where neither the plaintiffs nor defendant contested the validity of the contracts subject to breach of contract claims); *Degutis v. Fin. Freedom, LLC,* 978 F. Supp. 2d 1243 (M.D. Fla. 2013) (homeowner failed to state plausible unjust enrichment claim under Florida law, where express mortgage contract existed and homeowner was not alleging that contract was invalid); *and Central Magnetic Imaging Open MRI of Plantation, Ltd. v. State Farm Mut. Auto Ins. Co.*, 789 F. Supp. 2d 1311 (S.D. Fla. 2011) (provider of MRI services, as assignee of insureds' personal injury protection benefits could not pursue unjust enrichment claim against insurer because it could only sue under the insurance policy). Each of those cases is inapposite because Shift does not have a valid contract with the Defendants, and thus has no ability to pursue claims for breach of contract against them.

guaranty; and Shift transferred $2,005,952.00 to the Insight Defendants pursuant to the July 2024 Agreement. *See* FAC ¶ 60. The FAC further alleges that Shift conferred those benefits without knowing material facts -- namely, that CarePoint was preparing to file bankruptcy and that Bawahab lacked authority to sign for CarePoint. *See id.* ¶ 61. It would be inequitable, the FAC alleges, for Defendants to retain those benefits without paying Shift. *See id.* ¶¶ 62-64. Those allegations state an alternative unjust-enrichment claim.

Finally, Rule 8 independently permits the claim to proceed at this stage. A party may plead alternative and even inconsistent claims. Fed. R. Civ. P. 8(d)(2)-(3). The FAC alleges fraudulent inducement and an authority defect, and it notes that Insight Chicago has denied liability in a related arbitration based on unilateral and/or mutual mistake. FAC ¶ 26 n.1. At minimum, the validity, scope, and availability of contractual remedies are not issues that should be resolved against Shift on a motion to dismiss an alternative equitable claim against non-parties to the July 2024 Agreement.

**CONCLUSION**

For the foregoing reasons, Plaintiff respectfully submits that the Court should deny the Motion to Dismiss, and award such other and further relief as the Court deems just and proper. In the event the Court grants all or any portion of the Motion, Plaintiff respectfully requests leave to amend.

15

Dated: June 13, 2026

Respectfully submitted,

**POLSINELLI PC**

By: */s/ Michelle G. Bernstein*
Michelle G. Bernstein
Florida Bar No. 1030736
Marx P. Calderón
Florida Bar No. 1065228
315 S. Biscayne Blvd., Suite 400
Miami, FL 33131
Telephone: (305) 921-1800
mbernstein@polsinelli.com
mcalderon@polsinelli.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that, on June 13, 2026, the foregoing was electronically filed electronically through the CM/ECF system, thereby serving electronic notice to all counsel of record.

*Michelle G. Bernstein*
Michelle G. Bernstein

16